**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Paul PARKER, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeannette PARKER, Defendant–Appellant.**

Nos. 91–10461, 91–10462.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1993.

Decided April 20, 1993.

Annette R. Quintana, Las Vegas, NV, for defendant-appellant Paul Parker.

Lorraine J. Mansfield, Las Vegas, NV, for defendant-appellant Jeannette Parker.

Anne Kristina Perry, Asst. U.S. Atty., Las Vegas, NV, for plaintiff-appellee.

Before: NORRIS, HALL, and NOONAN, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Paul Parker ("Paul") and Jeannette Parker ("Jeannette") were convicted of (I) smuggling psittacine bird eggs from Aus-tralia, in violation of 18 U.S.C. § 545, (II) conspiracy to smuggle these eggs, in viola-tion of 18 U.S.C. § 371, (III) aiding and abetting their smuggling, in violation of 18 U.S.C. § 2, and (IV) unlawful sale of the hatched baby birds, in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1)(B). They raise numerous challenges to their convictions and sentences. We have juris-diction pursuant to 28 U.S.C. § 1291, and we affirm.

## CLAIMS RAISED JOINTLY BY PAUL AND JEANNETTE

### I. *Lesser Included Offense Instruction*

Paul and Jeannette claim, for the first time on appeal, that they were entitled to a lesser included offense instruction on the unlawful sale of wildlife counts under the Lacey Act, 16 U.S.C. § 3372 *et seq.* The jury was instructed on the felony of-fense under the Lacey Act, a crime which requires actual knowledge that the wildlife was unlawfully taken or possessed. 16 U.S.C. § 3373(d)(1). The Parkers contend that the jury should also have been in-structed on the lesser included misdemean-or charge, which requires that an individual "in the exercise of due care *should know*" that the wildlife at issue was unlawfully taken or possessed. *Id.* at § 3373(d)(2).

Because defense counsel did not re-quest a lesser included offense instruction at trial, the court's failure to give such an instruction *sua sponte* is reviewed for plain error. *Guam v. Ignacio*, 852 F.2d 459, 462 (9th Cir.1988). "Plain error will be found only if the error was highly prejudicial and there was a high probability that the error materially affected the verdict." *United States v. Bosch*, 951 F.2d 1546, 1548 (9th Cir.1991) (internal quotation omitted). We believe the failure to give a lesser included offense instruction did not materially af-fect the verdicts here. The Parkers were convicted not only of the Lacey Act felo-nies, but also of smuggling under 18 U.S.C. § 545 and aiding and abetting smuggling under 18 U.S.C. § 2, both of which require that the defendants act with knowledge that the goods were imported contrary to

law. Hence, a jury could not rationally have found that the Parkers were guilty of smuggling the bird eggs, on the one hand, and then acted without knowledge that the eggs were unlawfully obtained when they sold the baby birds. Accordingly, the court's failure to give a lesser included offense instruction did not rise to the level of plain error.

## II. Cross–Examination of Witness Jeff Fruits

■ The Parkers contend that they were deprived of the right to effectively cross-examine witness Jeff Fruits. Fruits, who sold birds for the Parkers, testified as a witness for the prosecution. He entered into a plea agreement whereby he received a misdemeanor conviction with a recommendation of probation in exchange for his testimony. Fruits has a license from the USDA for raising animals. On cross-examination, Fruits was asked, "What does that license allow you to do?" and then asked whether he had discussed the status of the license with Special Agent Dominguez, the Fish and Wildlife agent who was handling the Parkers' case. The government objected to these questions, and the court sustained the objections on the ground of relevance.

■ The Parkers argue that these questions were essential to showing Fruits' possible bias. They assert that the USDA license may have been the most important thing in Fruits' life and that he may have cut a deal with the prosecution in which he would be able to retain the license. But the Parkers present no evidence to support this assertion. "When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness." *United States v. Lopez*, 885 F.2d 1428, 1438 (9th Cir.1989) (internal citation omitted). Here, the jury heard that Fruits was an accomplice to the crime, and that he had entered into a favorable deal with the government that would allow him to preserve his teaching career by avoiding a felony conviction.

The jury also heard about inconsistencies in Fruits' earlier testimony to agents. This was ample information on which to evaluate Fruits' possible biases and motivations.

## III. The "Theory of Defense" Instruction

■■ The Parkers claim the court erred by rejecting their proposed "theory of defense" instruction. We disagree. A "theory of defense" instruction need not be given when it is simply a recitation of the facts told from the defendant's perspective. *United States v. Nevitt*, 563 F.2d 406, 409 (9th Cir.1977). The instruction tendered by the Parkers, and rejected by the court, was more like a closing argument than a statement of applicable law. The Parkers' theory of defense—that they did not know the cockatoo eggs were from Australia—was adequately covered by the standard instruction on the meaning of "knowingly."

## CLAIMS RAISED BY PAUL PARKER

## IV. Application of the CITES Treaty to the Importation of Bird Eggs

■ Paul concedes that the Convention on International Trade in Endangered Species ("CITES") prohibits the importation of rose-breasted cockatoos, since it is included under the Order Psittaciformes. *See* 50 C.F.R. § 23.23(f). He argues, however that the CITES does not prohibit the importation of rose-breasted cockatoo *eggs*. We disagree. The CITES treaty, incorporated at 50 C.F.R. §§ 23.1 *et seq.*, forbids commerce in "all living or dead animals [listed in the various appendices to the treaty] and all readily recognizable parts and derivatives thereof." 50 C.F.R. § 23.23(d). A bird egg is certainly a recognizable part or derivative of a live bird. Accordingly, there was no error in instructing the jury that the importation of rose-breasted cockatoo eggs is prohibited.

## V. Duplicity in the Superseding Indictment

■ Paul claims that 23 counts in the 25–count superseding indictment were impermissibly duplicitous. Duplicity is defined as the combining of two or more

distinct offenses into a single count. *United States v. Uco Oil, Inc.*, 546 F.2d 833, 835 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). The indictment was not duplicitous here. Each count of which Paul complains described a single offense—either an unlawful sale under 16 U.S.C. § 3372, or an act of smuggling under 18 U.S.C. § 545. What makes these offenses different from the ordinary criminal offense is that they are triggered by a violation of a separate underlying law or regulation. Neither the prosecutor nor the court led the jury to believe that the underlying violations were additional offenses for which the defendants could be convicted.

## VI. *Unanimity Instruction*

■ Paul contends, for the first time on appeal, that the jury should have been given a specific unanimity instruction because of the alleged duplicity in the indictment. Because we conclude that the indictment was not duplicitous, and because we do not believe there was "a genuine possibility of jury confusion or [of] a conviction [occurring] as the result of different jurors concluding that the defendant committed different acts," we hold that no specific unanimity instruction was necessary. *See United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir.1989). The general instruction that the jury's verdict must be unanimous was sufficient to protect the defendant's rights.

## VII. *Vouching Misconduct*

■ In closing argument, the prosecutor made certain statements which Paul alleges were an improper attempt to vouch for the truthfulness of government witnesses. Because Paul did not raise this objection at trial, we review only for plain error. *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir.1991). We reverse only if, viewing the error in the context of the entire record, the impropriety "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings, or where failing to reverse a conviction would amount to a miscarriage of justice." *United States v. Necoechea*, 986 F.2d 1273 (9th Cir.1993), at 1254.

Paul complains primarily about statements made by the prosecutor in response to defense counsel's attacks on the credibility of government witnesses Deborah Campling and Paul Fruits, both of whom were accomplices to the Parkers' crimes.[1] Defense counsel stated in closing that Campling and Fruits both had "a lot to gain from their testimony" because they hadn't yet been sentenced and because "[part] of the deal is that the United States government is going to advise the sentencing judge on Fruits and Campling as to how they did. Did they do what we wanted them to do?" Defense counsel also described Fruits and Campling as "liars." In response, the prosecutor said:

> Ms. Campling and Mr. Fruits … haven't been sentenced yet, and they made this deal with the government, and the government's going to go in there and tell the judge how good they did.
>
> Well, I guess the suggestion is that if somebody came in and lied, we wouldn't tell the judge. As officers of the court, we have a duty to do that, ladies and gentlemen. If you know someone is up

---

1. Paul also complains about the prosecutor's statement that Campling "acknowledged she could be facing a perjury charge if she lied, which would be far more damaging to her career, in fact, devastating to her career, than a misdemeanor conviction for the unlawful sale of wildlife." This was not error because it was a fair recounting of the witness' own testimony.

 In addition, Paul complains that the prosecutor "overstepped permissible bounds" on rebuttal by stating that "the government is required to prosecute each and every case as it comes along, whether it be against a gang member, or whether it be against Paul and Jeannette Par- ker." The prosecutor's comment was made in response to defense counsel's blatant plea for jury nullification, in which he told the jury to send a message that the government "should be spending their thousands of dollars on other things like gangs and dope and not this kind of case such as innocent elderly people." Under the "invited reply" rule, a prosecutor may respond substantially to a defense counsel's attack in order to "right the scale." *United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985). The prosecutor's comments were invited, and she committed no error in responding the way she did.

there lying, you've got to tell him. And so that's not a good deal either.

Paul argues that the prosecutor's statement implied that she had some way of independently verifying the truthfulness of the testimony given by government witnesses, and that she knew her witnesses had testified truthfully. We disagree. Given the context in which the statement was made, we think reasonable jurors would have understood the prosecutor to mean only that she had a duty to tell the judge whenever she knew, or had reason to believe, that a government witness had lied on the stand. This was an accurate statement of the law.

The statement was made in direct response to defense counsel's repeated attacks on the veracity of Campling and Fruits. By informing the jury that witnesses face severe consequences if they lie on the stand, and that the prosecutor is under an obligation to make such lying known to the judge, the prosecutor simply tried to counteract defense counsel's suggestion that government witnesses had everything to gain, and nothing to lose, from lying. This did not place the imprimatur of the government on the witnesses' testimony; it merely clarified the risks a witness would face by lying. Accordingly, we hold that the prosecutor's statements did not amount to a miscarriage of justice.

## VIII. *Vindictive Prosecution*

 Finally, Paul claims he was the victim of vindictive prosecution because the prosecutors and case agents had improper motives for not allowing him to enter a guilty plea and forcing him to stand trial—namely, the desire for political gain and the desire to force the forfeiture of $30,000 in certificates of deposit. This claim has no merit. The doctrine of vindictive prosecution does not apply when, as in this case, neither the severity of the charge nor the sentence has been increased. *United States v. Osif,* 789 F.2d 1404, 1405 (9th Cir.1986).

## CLAIMS RAISED BY JEANNETTE PARKER

### IX. *Sufficiency of the Evidence*

 Jeannette argues that the evidence was insufficient to support her convictions on the smuggling and Lacey Act charges. At the close of the government's case, Jeannette moved unsuccessfully under Rule 29(a) for a judgment of acquittal. Because this motion was not renewed at the close of all evidence, the district court's decision to deny the original motion is reviewed only for plain error. *United States v. Ramirez,* 880 F.2d 236, 238 (9th Cir. 1989).

 Jeannette argues, as an initial matter, that the Lacey Act was intended to deal with "a massive illegal trade in fish and wildlife," and that her activities were too trivial to be considered a violation of the statute. This argument has no merit. The statute attempts to combat a "massive illegal trade" by punishing illegal traders, regardless of whether their individual transactions are massive or not. By its terms, the Lacey Act classifies as a felony the unlawful sale of wildlife bearing a value in excess of $350. At least 10 individuals testified to having made purchases of the Parker birds for over $350, one of whom alone purchased more than 20 birds. This sort of activity falls well within the ambit of the statute.

 Jeannette next argues that the evidence was insufficient to support a conviction on any of the charges against her. We disagree. The evidence demonstrated that Paul and Jeannette incubated the unlawfully imported eggs, raised and fed the baby birds, recruited other individuals to help sell the birds, and facilitated their sale. Viewing all the evidence in the light most favorable to the government, we are satisfied that a rational trier of fact could have found her guilty beyond a reasonable doubt of the crimes charged.

### X. *Evidentiary Rulings*

Jeannette argues that the court abused its discretion in excluding certain evidence and testimony from the trial. We address each evidentiary ruling in turn:

**A. *The Banding of Baby Birds.*** Birds bought from the Parkers had closed bands on their legs. Defense counsel attempted to ask bird seller William Bohlever what his belief was concerning these closed bands. The prosecutor objected and the court sustained this objection. The defense offered to prove that the closed bands were an indication that the birds were born in the United States. The district court did not abuse its discretion in excluding this testimony. The issue of where the birds were born was never in dispute; the birds were hatched in the Parkers' home. The question was whether the eggs came from Arizona or Australia, and, as the court properly concluded, Bohlever's belief about the significance of the bands did not bear directly on this question.

**B. *Hypothetical Question to Defense Witness Feukes.*** Trenton Feukes, an IRS examiner from Las Vegas, testified as a defense witness regarding his experience raising and breeding exotic birds. Defense counsel asked Feukes whether he thought it was possible for bird eggs to survive a lengthy airplane ride stuffed inside an oversized t-shirt. The prosecutor objected on the ground that this was a hypothetical question asked of a witness who was not qualified as an expert. The court sustained the objection. Because defense counsel made no effort to qualify Feukes as an expert, the district court properly excluded Feukes' answer to the hypothetical question.

**C. *Bird Talk Magazines.*** The Parkers offered baby rose-breasted cockatoos for sale during the fall and winter months. Government witnesses testified that cockatoos bred only in the summer months, and so the bird eggs must have come from Australia, where it was winter. Defense counsel attempted unsuccessfully to introduce into evidence issues of *Bird Talk* magazine which included advertisements purporting to offer baby birds for sale in the winter. The district court's exclusion of the magazines was not an abuse of discretion. The advertisements were hearsay, and there was no way to guarantee their reliability. Moreover, the advertisements appeared on dates falling outside the scope of the indictment. In addition, the jury had already heard testimony from two witnesses who had bought birds from the Parkers that they didn't find the availability of the birds in the fall to be particularly unique. Hence, it was reasonable for the court to conclude that the *Bird Talk* advertisements were neither sufficiently probative, nor sufficiently trustworthy to require their admission under an exception to the hearsay rule.

**D. *Jeannette's Testimony Regarding the Source of the Eggs.*** Jeannette argues that she was not allowed "to testify as to why she believed the eggs could not have come from Australia." This is misleading. In fact, Jeannette did testify that she believed the birds she raised came from Arizona because her egg suppliers, John and Suzette, told her so. She also testified that her eggs could not have come from far away because it would have been difficult to provide the care needed for incubation. The question the prosecutor objected to was defense counsel's request that Mrs. Parker "tell the jury why they should believe you when you say you didn't know these eggs came from Australia, assuming they did?" In light of Mrs. Parker's earlier testimony on the subject, this question was irrelevant and cumulative. The court did not abuse its discretion in sustaining the objection.

## XI. *The Jury Forfeiture Verdict*

After the Parkers were convicted, the government sought forfeiture of the birds and of $97,000. The jury returned a verdict forfeiting the birds plus $5000. Jeannette claims that the $5000 figure is an implicit valuation of all the birds the Parkers sold, and since she was found guilty of 23 counts of unlawful sale, the jury must have valued the birds at $217.39 per sale ($5000 divided by 23). Because a felony offense under the Lacey Act requires a sale of wildlife having a market value of over $350, *see* 16 U.S.C. § 3373(d)(1)(B), Jeannette argues that her felony convictions must be reversed.

This argument fails. Jeannette presents no authority for the proposition that a valuation implicit in a forfeiture verdict is controlling on the guilt verdict. The forfeiture phase of the case took place after the jury had already convicted the Parkers of twenty-three felonies, and the jury may well have concluded that a large monetary fine was unnecessary. *See United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 476–77, 83 L.Ed.2d 461 (1984) (inconsistent verdicts on two separate counts of an indictment may result from "mistake, compromise or lenity" and are not grounds for reversal or remand). Indeed, defense counsel's argument to the jury during the forfeiture phase was primarily a plea for leniency.

The jury heard substantial evidence that the birds purchased from the Parkers each cost more than $350. Jeannette herself conceded that the birds were sold for more than $1000 each. Accordingly, we see no basis for holding that a forfeiture verdict can invalidate a lawfully obtained conviction.

XII. *Reduction for Minimal Participation*

■ Jeannette argues, for the first time on appeal, that she should have been given a reduction in her offense level under U.S.S.G. § 3B1.2 because her participation in the bird smuggling and selling scheme was minimal. Because she never sought this reduction at sentencing, we hold this claim to be waived. *United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir. 1991).

XIII. *Discretionary Downward Departure for Aberrant Conduct*

■ Jeannette asked for a discretionary downward departure from the court on the ground that her involvement in the offense constituted "aberrant conduct." The district court clearly recognized that it had authority to grant a downward departure on the basis of aberrant conduct, but exercised its discretion not to grant a departure in this case. *See* Sentencing Transcript at 35–36 (THE COURT: "[Are you] asking the Court to accept for the downward departure motion [on aberrant conduct] ... what was it 36 separate transactions?"). A district court's discretionary decision not to depart from the Guidelines is not subject to review on appeal. *United States v. Morales,* 972 F.2d 1007, 1011 (9th Cir.1992).

AFFIRMED.